Let's take up the next case, Jackson v. McAlister. The argument for the appellant. May it please the Court, Counsel, my name is Barbara Scherr and I represent the respondent, Wendy McAlister. I hope I can do as good a job as the pro se litigant who was just before us did a lovely job. It's really inspiring to me to see somebody representing themselves. Your Honor, we are asking that this Court reverse and remand Judge Coker's October 2nd, 2015 order. To begin with, it was against the manifest weight of the evidence in determining that there had been a substantial change in circumstances justifying child support paid by my client, Wendy McAlister, to Keith Jackson. Beyond that, even if this Court were to find that there was a substantial change of circumstances to justify the payment of child support by Wendy to Keith, and I'm going to ask you to excuse my informality, but I think it makes it easier to just follow it if we talk about them in terms of their names instead of appellant, respondent, cross petitioner, all of that. Even if this Court found that there was a substantial change of circumstances justifying payment of child support by Wendy to Keith, the decision as far as the amount to be paid, not only by Wendy to Keith, but by Keith back to Wendy, because I'm sure you're aware that these were sort of competing petitions for child support filed at different times. The decision itself was arbitrary. It was an abuse of discretion. There was no justification for it. Both my brief and that of my opposing party's counsel, Mark Gore, we lay out the legal standards. We make our arguments. We cite the cases. We cite Barnard. We cite Bridenfell. We cite Dykin. We cite all of the cases. I want to talk more about what happened here on a practical and sensible level because aside from the legal standards that you're required to look at, I think particularly in a case such as this, we need to talk about what makes sense overall. So let's look at this. These parties are getting divorced in 2010 and early 2011. I believe it was April 11th, more or less, of 2011. We have a marital settlement agreement, and we have a joint parenting agreement. We have three children. We have Connor, who's the oldest. We have Serena, who's the middle child. And we have Cohen, who's not only the youngest at age six at the time of the marital settlement agreement, but he's also got some learning disabilities, some educational issues. He's going to school. These parties were living in Monroe County but going to school. They're sending their child to school in far west St. Louis County at Mason and Olive. And my client, when he's doing the majority of the driving, he's going to a private school out there called Churchill School. It specializes in learning disabilities. We have a split between the parties. I mean, my client would refer to it as 60-40. I think Mr. Gore's client would refer to it more as a 56-44, a distinction without a difference. But the children are spending the majority of the time with Wendy. About nine, ten months after the marital settlement agreement, which provided that there would be no child support, but there's no reason for a statutory deviation stated in the marital settlement agreement, which I take issue with, and I think under the child support statute, even with the changes that took place, what are we now, six and a half months ago, the changes to the IMDMA, there should have been some explanation as to why there was no child support order. The parties were ordered to share, pretty much share all expenses, but they were each maintaining their own households. So here we are in 2010-2011. They have this marital settlement agreement. Kids are with Wendy the majority of the time, not a high majority, but the majority of the time. Nine months later, she files for a change of circumstances, a modification of child support. Clearly, Judge Coker found that there was a basis to determine that there was a substantial change. How do we know that? Because child support was ordered to Wendy. Not much, but there was some child support ordered to Wendy. Wendy files in January of 2012. At that point, all three children are still living with her. We have a period of time where there is absolutely no compliance with discovery. It was about a year and a half later that we first see the filing of a financial affidavit. If you look at the record, and I believe I have it in my brief attached as part of the appendix, you see motions to compel, you see 201K letters, you see the efforts that you're supposed to engage in under Illinois Supreme Court Rule 201K to resolve discovery disputes. You see that this is in somewhat active litigation, but there's no response by Keith. Suddenly, two years after Wendy files her petition to modify child support, Keith files his motion to modify not only the custody arrangement, I guess now we would call it the parental allocation arrangement, but also suddenly he wants child support because one child is living with him. Then we have an order, and we're now almost two years later from the time Keith files, because we're in October 2015, which three months later we would have been in January 16th. We have an order from the trial court that doesn't make a whole lot of sense to me when you look at it overall. We see that the court clearly found that there was a substantial change in circumstances. We see that this court seems to take great pity on Keith for this horrible financial situation he's in. And frankly, I don't think his situation seems that empathetic. I'm not empathetic to it, nor am I sympathetic to it. Why? He's living well above his means. We see that his monthly expenses look like his monthly expenses are over $7,000, but his income, depending on whether you look at his affidavit of assets and liabilities or what Judge Coker determined to be his income, are somewhere between $1,800 and $2,300 a month. While that may be true, that doesn't explain how somebody with that income is renting a five-bedroom house or needs to rent a five-bedroom house for himself and his 15, now 17, almost 18-year-old son, why he needs a pool, why, if his income situation is so dire, he's voluntarily paying real estate taxes of $25,000 to $30,000 a year that are not required by his lease that he has with his landlord. During this time period, and he, you may recall from the brief, in 2010, which is around the time that the parties are separating and divorcing, he leaves his job at FABIC, where he's earning over $100,000 a year, and he starts his own business. Granted, that's okay. We all get to do that. We get to start our own business. But five years later at trial, when he's not making enough money to supposedly support his lifestyle, yet he's got no debt and is living this high lifestyle, why isn't he going out and getting another job? Why is he looking for a more traditional job where you have a salary and a paycheck? The court takes pity on him for this situation, but they fail to overlook the fact that, I mean, they overlook the fact, pardon me, that he's got no supporting documentation for his finances. They say that there's no evidence that he's hiding income, yet, I mean, if I were to come before this court and say, hi, my income is $2,000 a month, yet my expenses per month are $7,500. I'm living in a five-bedroom house with a pool, yet I've got no debt. I pay back $200,000 in loans I've taken out for this business that's only giving me income of at best $2,500 a month. I would think that you would be wondering, why is she doing this? Why isn't she going out and getting a job? And maybe she is hiding income if she's managing to support this lifestyle, yet has no credit card debt. Her rent's not behind. She's voluntarily paying taxes. I'm donating $6,300 a year to charity. It just doesn't make sense. As they would say, this dog does not hunt. It doesn't make sense. It doesn't add up. The court says that Keith is in a difficult situation, and he's taken money out of his retirement to pay back these loans. He doesn't have any income. Keith has an S corporation. With an S corporation, you determine your dividends. He's got retained earnings. I suspect if this court were to see what Keith's finances have been since the date of his order, something that I would be seeing in the next year as Connor turns 18 and graduates from high school, you're probably going to see that once this case was over, he did start taking income. He gets to determine his own income. He's not a sympathetic figure. The court used calculations, or we don't really know what they are from the court's order, to determine his income without any basis. Yet the court at the same time, although Keith is not doing anything to really have what I would call a responsible adult income and is living irresponsibly, at the same time, the court is very, very hard on Wendy. They're critical of Wendy. They find her lacking in credibility. I think that was Judge Clover's terms within the transcript, and I believe within the October 2, 2015 order. Why is Wendy lacking in credibility? Wendy is lacking in credibility because Wendy does not live in a home with her then second husband, Brandon McAllister. Okay, there is nothing in the case law or under the IMDMA, either in the prior statute or the changes that took effect in 2016, that indicate a parent has to reduce expenses or have more available income by living with a subsequent spouse or combining assets. There's nothing that requires her to live in a traditional marriage. And, in fact, the reality that she and her then second husband, who I will refer to as Brandon because his name is Brandon, maintained two separate households, didn't have a joint checking account or combined assets, the way many people do in a traditional marriage. The fact that she didn't do that isn't required by anything. Frankly, the fact that the court criticizes her for that, and those are really the only things that the court cites or mentions as showing that she was lacking in credibility. I mean, frankly, I don't know that that's a precedent we want to set in Illinois as a reason that somebody gets hit up with child support. And when you look at that juxtaposed to the fact that he, who is the father of these children, who has the financial responsibility to support them under the law and ethically, is living this, what I would call, a flagrant and luxurious lifestyle, an irresponsible lifestyle that he can't support, I would be more concerned with that than the fact that Wendy and her husband maintained two separate households. Also, the fact that Wendy and Brandon McAllister maintained two separate households was not a change of circumstances from the time of the MSA in April of 2011. The house that Wendy maintained throughout this litigation was the house that she maintained at the time they separated. It's not like, yes, would she have probably saved money if she and Brandon McAllister lived together? Of course she would have. Everybody knows it's cheaper for two people to live together in the same house than two people to live separately. But she's not required to do that. She testified at trial initially that she didn't know Brandon McAllister's income, and that I believe later on she said she did. They didn't combine finances. I mean, that could have been more her faltering when she was asked that question could have had to do more with nervousness or something that was going on in the background that is not necessarily part of the record than a lacking in credibility. If you look at the decision overall, I think that there was probably a dislike or there was some reason that this court, the trial court, pardon me, criticized Wendy that's not based on anything that should be upheld pursuant to statute or case law. Keith also, he purchased new cars. I mean, although Wendy purchased a new car herself, I mean, he's purchasing a new car for his son, yet at the same time he needs child support. Look at the decision overall. Here we have a situation where Wendy is supporting two kids, Keith is supporting one. They're all paying for the extraordinary expenses for the kids. There was no change in circumstances as far as each party's overall household expenses when Connor went to live with Keith. I mean, the only thing that was pointed out that Wendy stopped paying for on behalf of Connor was she didn't pay for half of his soccer fees, and I think that the record is absent as to why that happened. But what the case law does require the court to consider and what the statute talks about is child support awards are supposed to be in the best interest. I guess my question is how is it in the best interest to be taking money out of Wendy's household to put into Keith? And I know overall we're talking about a difference of $55 a month, so you're probably wondering why are we here over $55 a month. But overall, if you look at the best interest standard, it just doesn't make sense that suddenly Wendy has to start paying child support to Keith when Connor goes to live at her house. I mean, if you look at the Turk case, it talks about, I mean, we have a case there where custodial pays to non-custodial parents. Just overall, this decision is questionable because there's no rationale, there are no findings as to what the court was basing the income calculations on. We also don't know what the court was doing, whether it was 28% from Keith to Wendy and 20% back from Wendy to Keith. We don't know. There's just a lack of clarity, which makes me question the decision overall. I guess another way to go about this case would be to say, okay, there are three kids, two with one parent, one with the other. Let's assume each is supporting one, and then Keith should pay 20% to Wendy since she has two. That would be one way of looking at it. And I understand that the case law and the statute gives us no guidance. I also understand that with the changes to the INDMA on child support, although really the only change in the statute is, or the big change in the statute regarding child support, is that now you can deduct student loan repayment as far as determining overall what constitutes net income for child support. I mean, I think we all know that there's a trend in the statute overall to more time with both parents and maintaining more of your own household for the time that you have the kids. I would ask this Court to just look at the overall, the way this looks overall. Initially, there was a two-year period of time where we know Wendy had all three kids. If this Court found, pardon me, that there was a substantial change in circumstances that justified a payment of child support by Keith to Wendy, which the trial court did, and there's been no challenge to that, there's no cross-appeal going on yet, then what possible reason do we have for Wendy not to be awarded retroactive child support for what we know is a two-year period of time from January of 12, when she filed for a modification, till at least January of 14, when the October 2, 2015 order indicates Connor began living with Keith. You can finish that sentence. That Connor began living with Keith. So, therefore, there's a two-year period there that we know for sure everybody agrees Wendy had all three children. Thank you. Thank you, counsel. Argument on behalf of the appellee. Good morning. I'm Mark Brewer. I represent the appellee, Keith Jackson. May it please the Court, counsel. There are so many errors in what you just heard that I think I covered all in my brief. I will attribute that to counsel not having been in the trial court herself, having tried the case, or having lived with the case while this went on, which I did. I'm going to start with talking about some errors that were in Wendy's reply brief that I wanted to call to the Court's attention. On page five of that brief, she states, Modification of child support is warranted only if the trial court finds, by clear and convincing evidence, that both, one, a change of circumstances has occurred, and, two, modification is necessary to serve the best interests of the minor child. Citing 750 ILCS 5-510. That's wrong for two reasons. First of all, there's not a requirement. She's making a showing by clear and convincing evidence. And, two, there's not a requirement in the statute of finding that modification is necessary to serve the best interests of the child. On page six of that brief, she states, A trial court is required to state in its decision specific findings of fact in support of its modification if either parent opposes the modification and cites 750 ILCS 5-610B. That section deals with modification of custody, not child support. Section 510 deals with modification of child support and doesn't have that language in it. Third error, also on page six, restated, the trial court must not only find that a substantial change of circumstances has occurred, but it also find that the modification is in the best interest of the child. Again, citing 750 ILCS 5-610B, which again refers to custody and not child support. Fourth error in that brief is a quote on page seven. Keith attempts to argue that the trial court properly calculated Keith's income by accepting the figure he testified to, that being $2,034 per month, citing page 18 of my brief. Keith did not testify that his net income was $2,034 per month. He testified that his income after taxes was $1,858 per month. That's in the transcript on page 39. I did not make that argument that she contends that I made, but I did point out that the trial judge accepted Keith's testimony that his goal was an annual salary of $14,000 per year, which would be $3,333 per month. This was a business that Keith had started in 2010 before the divorce actually occurred. He'd been discharged from a very well-paying job, had a choice to make, and this was right around the time of the Great Recession when he was in the construction-type industry. He had a choice to make, try to find another job in that industry or start his own business. He elected to start his own business, and it's not easy starting a business, especially in that economic climate. He's still trying to make that business work, and so that's why he's talking about his goal being $40,000 a year. Fifth there on page 8, if a trial court wishes to deviate from the statutory guidelines, it must make specific findings as to the appropriateness of a deviation pursuant to statutory factors, including that the same is in the best interest of the minor child, this time citing 750-ILCS-5052, which is the child support statute. That subsection doesn't require the court to make a specific finding that the change is in the best interest of the child, only that the court consider the best interest in the light of the evidence. I also want to make some comments about the standard of review. There were two issues first, or two-step, one issue, child support modification. Two-step process. First, was there a substantial change in the financial circumstances of the party? That's to be viewed in light of the manifest way to the evidence standard. All presumptions are in favor of the trial court, and it's to be affirmed unless a contrary conclusion is clearly evident. And the case law is really that as a matter of law, a change of custody is a change of circumstances, a substantial change of circumstances. And that's what we have here, because Connor had a bad relationship with his mother, moved in with my client, and to suggest that that doesn't result in a substantial change of circumstances indicates that somebody has never raised a teenage son. It's obviously going to result in a lot of expenses, and I think I laid out expenses that were relating to Connor in my brief. The second step is whether and by how much to modify, and that's the abuse of discretion standard. And that standard, of course, is the most deferential standard that there is, next to no review at all. In order to overcome that standard, it has to be shown that the trial court acted either without conscientious judgment or that it exceeded the bounds of reason and ignored recognized principles and that substantial prejudice resulted. And I don't believe, based on the record that's before the court, that it comes anywhere close to that standard. Counsel says that we can't determine how Judge Colford came up with my client's net income. I've figured it out and I've included it in my brief, and it is apparent that he used that goal of $40,000, to which Chief testified, deducted taxes, and came up with the net income that he came up with. Counsel insinuates, or states rather, that the delay in this case was due to my client. I'm not responding to discovery. That is absolutely false. I've laid out the timeline in my brief. After the case was filed, it didn't move. Counsel here is third counsel on this case. First counsel, Mr. Courtney, very well respected attorney, very good attorney. He didn't move the case. He didn't send formal discovery requests. He sent me some letters, to which he received responses. At that point, this was before Connor had moved in with my client, there was really no incentive for me to move the case, so I didn't send out discovery responses, or requests. When we finally got around to sending out the discovery requests, either party did a real good job of complying completely and within the deadlines. And again, the record will show that. My brief lays out the timeline as to how that occurred. And Wendy was as much, if not more, at fault as my client was in that delay. Counsel says she doesn't know why the court found that Wendy didn't have credibility. Well, she wasn't there. She didn't see Wendy testify. She didn't hear what Wendy said. You know, one of the things that I just kind of touched on briefly was when I asked Wendy how long Mr. Courtney had represented her, she said, five to six months tops. Well, according to the file, he represented her for better than a year. That's an example of the lack of credibility of this woman. Counsel stated that my client voluntarily made real estate taxes on this house. Well, in the sense that if he didn't, he wouldn't live there. At that point, he was in a month-to-month lease type of situation, the written lease having expired, and he had difficulty complying with the terms of the original lease, and he owed the landlord a lot of money, and he was trying to make good with the landlord. With regard to the alleged extravagance of this house, it wasn't only a residence, but it was also a place of business. Keith testified as to the dollars that it would have cost him to rent a separate facility for an office, and he saved money by renting this residence and working out of the residence. Counsel said that my client, Keith, had no debt. That's false, and it's laid out in my brief with citations to the record as to what debt that he had. He had credit card debt that he'd run up. He was living beyond his means. A lot of that was supporting the kids. This school that the youngest child went to was not cheap, and Keith paid his share of that. The way these people worked these expenses, and this wasn't even required by the marital settlement agreement. This is just how they did it. When they had an extraordinary expense for one of the children, extracurricular activities, medical, the schooling, they would each pay them, and then quarterly, they would do a recap of those, and whoever had paid more would reimburse the other for half so that they could come out even. The testimony was that usually Keith had to pay when. Keith was carrying a heavy load here, and he was supporting his kids in the standard of living. He was trying to keep their standard of living the same that it had been, although he was starting a new business, which is a difficult proposition. Does the record indicate that he followed the same procedure in his two-year time period, and subsequently followed the repetition? Yes, it did. She talks about retained earnings. The business has retained earnings. The 2014 tax return showed that the retained earnings was negative, like a negative $234,000. I'm not sure of the exact number, but it was negative. There were no retained earnings. This is a new business that was starting. Keith shoveled all of his retirement money into this business, almost all of his assets into this business. He did pay himself back, but then he lived on the money that the corporation paid him back eventually for those loans. Now he has no retirement. Meanwhile, Wendy has a well-paying job as a nurse, and actually the trial court understated her income, which, again, is clearly made the calculations in my brief that clearly show that. Keith chose not to appeal. He thought it would make the case cost more and didn't want to pursue that. But, you know, I do think the court understated her income. As far as who has the kids, at this point, Keith has the children more than she does. He has one child full-time, all the time. He doesn't, he hardly ever, well, he spent the night, one night overnight with his mother during this whole procedure. The rest of the time, he's with Keith. He visits his mother for a few hours. Other than that, Keith has that child all the time, responsible for all of his expenses. The younger children, it's either a 56-44 split or a 60-40 split with Keith having the lower percentage. When you put them all together, Keith has the children, collectively, more than Wendy. He wouldn't be entitled to child support from her. I think that's all I intended to cover. If there are any questions, I'd be happy to try to answer them. Well, thank you. Reba. You know, Mr. Roar starts out by talking about the fact that I wasn't there at trial. Well, obviously, I wasn't. She did have two other attorneys prior to myself. And, you know, I've debated this with myself over the years because I do a fair amount of appeals. I'm primarily a litigator. Whether it's better to be trial counsel in the appeal or not, I don't have an answer. There are benefits and detriments both ways, and I would hope that the three of you would agree with me on that. I mean, what is an appeal? It's an academic exercise. This is very much—it's similar to writing a thesis, and now I get to come in and defend it and make arguments about issues that aren't so much procedural and point out some other things. So I really don't know. I guess the benefit of not being trial counsel is that I can give it a fresh look. I can't tell you exactly what went on between the attorneys and conversations because, obviously, I wasn't there. Also, I would suggest that some of Mr. Roar's comments to that effect before this court are probably beyond the bounds of what anybody should be looking at. You're supposed to be looking at what's in the transcript, what's in the record, what's in our brief and the exhibit. Then, obviously, I'm hoping, considering what we've said here today. I notice that Mr. Roar talks about when he didn't have credibility because she couldn't remember when she's being questioned on the stand and presumably nervous, as many litigants are, that Chuck Fortney represented her for closer to a year than five to six months. Who cares? Why is that relevant? It has nothing to do with it. Mr. Roar conveniently avoids the majority of my arguments about overall this decision and the scenario between the parties not making sense. He argues that the fact that Connor went to live with Keith in January of 2014, that's clearly a change of circumstances because it's a change in what he refers to as custody. I think now we call it rental allocation or primary residence or one of those new terms under the IMDMA. But just because somebody moves, just because Connor began primarily living at dad's house instead of mom's doesn't mean that dad's expenses have changed. These parties are splitting expenses. It's not just a jump that because custody of where you're spending the night changes, that expenses at that other house change. And in reality, what goes on from the time a child goes to bed until the child gets up in the morning, I don't think that costs anybody money. Maybe you turn the heat up, maybe you turn it down, and it actually saves you money. So I don't know. I just am troubled by that neck, that logical jump that he's trying to put in front of you that this just makes sense because it really doesn't. But he avoids my arguments about the overall order of October 2, 2015 making sense. The case before us was about the scratch-offs. I mean, clearly they had a funner fact pattern than we have in our case. And I honestly believe that when I look at Judge Holker's October 2, 2015 order, that maybe there was something in there I missed about just kind of scratch-offs in making the decision because, in reality, there is very little in that decision that, one, makes sense based on the evidence, or, two, is explained. And you're supposed to make findings. And that's what this court needs to do. They need to send this back to Judge Holker to make some findings. Thank you. Thank you, Counselor Botheby, for your arguments and debriefs. We'll take this case under advisement. We're going to take a short recess before we call the 10 o'clock case.